[No. 40480.    En Banc.    September 10, 1970.]

THE STATE OF WASHINGTON, *Respondent*, v. GARY J. BAKER,
*Appellant.*\*

\*Reported in 474 P.2d 254.

*Barokas, Beitz & Schaefer,* by *Larry L. Barokas* and *David H. Beitz,* for appellant.

*Charles O. Carroll, C. N. Marshall,* and *Stuart A. Cohen,* for respondent.

FINLEY, J.—The defendant, Gary Baker, was charged with two counts of murder in the first degree. Initially he was charged by complaint in Seattle District Justice Court; subsequently an information to the same effect was filed in the superior court for King County, Washington. The defendant pleaded not guilty to each count of the information and initially also entered a special plea of insanity. The plea of insanity was withdrawn at the time of trial. After a prolonged trial, the jury returned a verdict of guilty of murder in the first degree on one count and guilty of murder in the second degree on the other count. The death penalty was not imposed. This appeal followed.

There is little dispute over the essential facts. There had been some marital difficulty between appellant Baker and his wife, the deceased Linda Baker. She had moved to the home of her mother, Mrs. Gelinda Capelli, who is the other decedent. On April 27, 1968, neighbors noticed the young son of the Bakers playing alone in the yard. Upon investigation they discovered the body of Mrs. Linda Baker, covered with blood, on the living room floor. Officers of the King County Sheriff's Office were summoned. Upon arrival they discovered the body of Mrs. Capelli. Both women had been killed by rifle bullets.

About 10 days later, Baker was driving through New Mexico and was stopped by Officer Gonzales of the Gallup, New Mexico, Police Department and asked for a driver's license and registration certificate. Baker had a driver's license but was unable to produce a registration certificate, although he did in fact own the car involved. Baker was then taken to the police station at Gallup, New Mexico. In view of the out-of-state license and the lack of registration,

Baker was apparently suspected of transporting a stolen vehicle across state lines, a federal crime. Consequently, upon his arrival at the police station, he was questioned by Special Agent Walton of the Federal Bureau of Investigation. There is no question but that he was fully advised of his rights prior to the questioning. The questions were about the car; Baker's answers concerned the Seattle homicide, and he admitted shooting his wife and mother-in-law with a rifle. He told the agent that he then fled the area, driving north from Seattle, and threw the murder weapon out of the car into the brush alongside Interstate 5.

The next day Baker was returned to Seattle by a detective of the King County Sheriff's Office. He repeated the confession in greater detail to the detective. Upon arriving in Seattle, Baker helped in a search for the murder rifle. The rifle was later found by a police officer in the vicinity of the searched area.

Baker was convicted of first-degree murder for the death of his wife and second-degree murder in the death of his mother-in-law.

There are several assignments of error in this appeal. Briefly stated, these involve (1) questionable tactics used by the prosecutor's office in obtaining a psychiatric report; (2) failure to grant a continuance; (3) failure to allow waiver of trial by jury; (4) the admission of incriminating statements; (5) improper cross-examination of character witnesses by the prosecutor; and (6) failure to give the jury an instruction on manslaughter. The assignments of error will be discussed in the sequence indicated.

## PSYCHIATRIC REPORT

Shortly after the charges were filed in justice court, the appointed defense counsel presented ex parte motions to Judge Dore for a psychiatrist to be appointed and admitted to the jail to examine Baker. The motions were granted. The appointed psychiatrist, Dr. Johnson, examined the defendant and reported his findings to counsel for the accused. There was nothing in the order directing the psychiatrist to report to the court or to the prosecutor. At this

point the charges were filed in the King County Superior Court and the case pre-assigned to Judge Agnew. After the accused entered a special plea of insanity, the state sought and obtained an order appointing another psychiatrist to examine Baker. On advice of counsel, Baker refused to talk to the second psychiatrist. Thereupon the state filed a motion in the superior court to require the first psychiatrist to report the results of his examination to the court and to the prosecutor. A hearing was set for this motion. Upon arrival in court to argue the motion, counsel for the accused discovered that the deputy prosecutor had already obtained possession of the report of the first-appointed psychiatrist. The report had been obtained by presenting an ex parte order to Judge Dore of Seattle District Justice Court, purporting to change the original order nunc pro tunc to direct Dr. Johnson to report to each party and to the court. The deputy prosecutor, armed with this order, then went to Dr. Johnson and obtained a copy of the report. Defense counsel came to the superior court hearing ready to argue the question of whether the prosecutor should have a copy of the report, but thereupon discovered that the legal processes for the resolution of this question had been short-circuited.

■ The question involved and now before this court is solely concerned with the *procedure* by which the deputy prosecutor (who did not argue this case on appeal) obtained the report. We specifically do not address the further question of whether the report should have been available if the motion in this respect actually had been pursued in superior court. In any event, it is relatively easy to resolve the question of whether the procedure used by the deputy prosecutor is defensible. If the order in question was validly issued, it is because of the authority granted by JCrR 8.03 which reads as follows:

> Rule 8.03 Clerical mistakes. Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court may order. If an appeal has been taken, such mistakes may be so corrected until the record has been filed in the appellate court, and thereafter while

the appeal is pending may be so corrected with the leave of the appellate court.

The intent of the rule was clearly to provide a simple means of correcting clerical or administrative errors. It does not provide a means of changing "a judgment in substance as by correcting an error of law contained therein. . . ." Trautman, *Vacation and Correction of Judgments,* 35 Wash. L. Rev. 505, 506 (1960). The rule also implies that even clerical errors can be corrected only while the justice court retains jurisdiction over the case unless the other court involved gives leave to make such correction. Once the charges were filed in Superior Court, the justice court had no authority to issue such an order. Even without a hearing pending in superior court on the same question, the order was in error. Furthermore, surreptitious action by the deputy prosecutor ex parte and without notice to defense counsel raises serious questions of professional misconduct which might well merit attention of the Board of Governors of the Washington State Bar Association. However, in any event, the question with which we are confronted is the extent to which the actions of the deputy prosecutor and the alleged error in this regard may have prejudiced the rights of the defendant to a fair trial.

An error, considered in a vacuum, does not give rise to an automatic reversal of a judicial determination. There must be some nexus with a right of the defendant substantially abridged by the error. It is difficult to perceive that nexus in the instant case. The plea of insanity was withdrawn before trial; the question of insanity was not in any way an issue at the trial. The report by the psychiatrist is a part of the record and clearly was not usable to establish a defense of insanity. So, even in the absence of the action by the deputy prosecutor, there is not the slightest indication that Baker could have presented a successful insanity defense.

As a means of restraining or regulating so-called "police" or "prosecutional" misconduct, there is an inherent inadequacy or weakness in the "exclusionary" rule originally

enunciated in *Weeks v. United States,* 232 U.S. 383, 58 L. Ed. 652, 34 S. Ct. 341 (1913), and since reiterated in *Mapp v. Ohio,* 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684 (1961), and in countless other cases. *See* Finley, *Who is on Trial—The Police? The Courts? or the Criminally Accused?* 57 J. Crim. L.C.&P.S. 379 (1966). Careful evaluation of the exclusionary rule suggests it is ineffective and of no practical utility in effecting a higher standard for police conduct in the specific criminal case. In other words, in a particular criminal case the exclusionary rule is like closing the barn door after the horse is out and gone. Furthermore, it is extremely dubious whether the exclusionary rule provides any effective continuing restraint or discouragement regarding tendencies toward misconduct by law enforcement people. Lastly, the rule goes too far in excluding crucial evidence—actually losing criminal cases for the state without any appreciable improvement in the standards for criminal law administration. The instant case presents another side of the coin. The exclusionary rule is totally ineffective in restraining or preventing official misconduct when there is no desire or attempt to introduce the "tainted" evidence at trial. Reliance upon the exclusionary rule tends to prevent the development of alternatives such as

> [j]udicial contempt citations for offensive law enforcement conduct and/or legislative imposition of penal sanctions for overzealous investigative activities, or provisions for recoupment of damages from the government for invasions of citizens' homes without warrant or probable cause . . .

57 J. Crim. L.C.&P.S. at 386.

Appellant suggests the use of another alternative—the dismissal of the information. To this end he cites *State v. Cory,* 62 Wn.2d 371, 382 P.2d 1019 (1963), wherein this court dismissed the information after finding that eavesdropping upon an attorney-client conference violated the right to counsel.

■ Dismissal of charges is an extraordinary remedy. It is available only when there has been prejudice to the

rights of the accused which materially affected the rights of the accused to a fair trial and that prejudice cannot be remedied by granting a new trial. In *State v. Cory, supra,* we stated:

> There is no way to isolate the prejudice resulting from an eavesdropping activity, such as this. If the prosecution gained information which aided it in the preparation of its case, that information would be as available in the second trial as in the first.

(Footnote omitted.) In *Cory* we assumed that the prosecutor had taken advantage of a simple means of "obtaining evidence and knowledge of the defendant's trial strategy" because there was no way of determining exactly what had been overheard. The basis for that assumption is not present in the instant case. The report of the psychiatrist is in evidence. This court is able to ascertain what, if any, prejudice resulted from the prosecutor's obtaining a copy of the report. As stated previously, prejudice cannot adhere when there is no nexus between official misconduct and a right of the accused.

Appellant also asserts that the obtaining of the report was a violation of the physician-patient relationship and the attorney-client relationship. However, all of the cases cited involved situations where there was clear prejudice to a defendant at trial when the prosecution called the psychiatrist as a witness or otherwise used the questionable material at trial. There is nothing in the instant report which had any significant effect upon the trial itself. The report was not introduced at trial, the psychiatrist was not called as a witness, and there was no information about the crime contained in the report which was not already possessed by the prosecutor. Consequently, we see no reason whatever to order dismissal of the charges, and the assignment of error as to this aspect of the case is without merit.

## DENIAL OF A CONTINUANCE

Baker also contends that the denial of a continuance by the trial judge was prejudicial in view of the conduct of the deputy prosecutor which necessitated additional preparation time. The trial was set for July 15, 1968, in response to

the defendant's demand for a trial within 60 days, and for more than a month before the trial date the defendant's attorney was aware of the deputy prosecuting attorney's action in obtaining the report. In view of this time frame, we are convinced the action of the trial judge in denying the continuance was not so arbitrary as to constitute an abuse of the discretion which a trial judge has in granting or denying continuances. *State v. Mays,* 65 Wn.2d 58, 395 P.2d 758 (1965).

## WAIVER OF TRIAL BY JURY

■ Appellant also contends that he should have been allowed to waive trial by jury and proceed to a trial before the court. There is no question but that RCW 9.48.030, RCW 10.01.060, and RCW 10.49.010 require trial by jury when a person is charged with murder in the first degree. *In re Brandon v. Webb,* 23 Wn.2d 155, 160 P.2d 529 (1945). Appellant's primary contention is that the above statutes are unconstitutional as a violation of equal protection insofar as they deny to the accused murderer those rights and privileges afforded to the criminally accused who are not charged with first-degree murder. Appellant's arguments, if accepted, would result in the elimination of the death penalty because, under our statutes, only the jury can find that the death penalty shall be imposed. The basic constitutional right which requires protection is the *right* to *have* a trial by jury, and the states are required to protect and promote that right. *Duncan v. Louisiana,* 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968). We fail to see how a statute which has the effect of extending and preserving that right can simultaneously be considered an invidious discrimination and consequently a violation of the Fourteenth Amendment.

Indeed we are convinced that the classification adopted by the aforementioned statutes is a reasonable one. As the United States Supreme Court said in *Witherspoon v. Illinois,* 391 U.S. 510, 521, 20 L. Ed. 2d 776, 784, 88 S. Ct. 1770 (1968), the determination made by a jury in a capital case "is different in kind from a finding that the defendant committed a specified criminal offense." We believe that

this difference in kind is sufficient to support the statutory scheme requiring jury trial in capital cases.

### ILLEGALLY STOPPING APPELLANT'S AUTOMOBILE

Baker contends that his confession was the "fruit" of an illegal arrest in New Mexico. His underlying premise is that the stopping of his car by New Mexico officers was illegal. The specific issue of a stop for driver's license and registration check has been considered and determined by the Attorney General of New Mexico in his 1966 report at page 76 (Attorney General Opinion No. 66-62), wherein it is stated:

> Section 64-13-39, N.M.S.A., 1953 Compilation (P.S.), provides that a non-resident motorist must have a valid license from his state of residence "in his immediate possession" if he wants to operate a motor vehicle in New Mexico.
>
> . . . [A] non-resident motorist can be required to show proof that his out-of-state vehicle is "duly registered in" some foreign state as is required under Section 64-6-1 (A), supra.
>
> In conducting such checks of vehicle registration an officer can detain a non-resident motorist for a brief time on the road to determine whether his vehicle is "duly registered in" the foreign state. If the motorist cannot show proof of such foreign registration, and if it appears that the vehicle probably is not duly registered, then he may be cited as a misdemeanant under Section 64-6-1 (A), supra.

N.M. Att'y Gen. Rep. (1966) at 76. The Attorney General reached the conclusion that the state statute validly authorized the stopping and checking of non-resident motorists by police if this was for the "good faith examination of the driver's license or vehicle registration." We accept this interpretation of the law of New Mexico and thus need not reach the further question of whether the confession should have been excluded had the stop been illegal.

### QUESTIONS ASKED OF CHARACTER WITNESSES

During the trial the defendant called several character witnesses. One of these witnesses, Jerry Cadena, had

served with Baker in the United States Navy. He testified that Baker's reputation as a peaceable and law abiding person was good. On cross-examination he was asked the following two questions:

Q Did you know that, in September of 1958, he and two others stole an automobile and drove to New York City where they were arrested?

Q Did you know that, in the fall, of 1967, while stationed in Memphis, Tennessee, he dated Bonnie Johnston, telling her . . . that he was a divorced man and that, when Bonnie Johnston discovered that Baker was married, she broke off relations with him; and that, subsequently, she had to phone for the police because of threats made by Baker against her and her new boyfriend?

█ On the issue of permissible questions for character witnesses, this court has said "character witnesses may be cross-examined as to their knowledge of particular acts of misconduct on the part of the person whose conduct is in issue, providing the primary purpose is to discredit the testimony of the character witness." *State v. Anderson,* 46 Wn.2d 864, 285 P.2d 879 (1955). In applying this standard, wide latitude has been given to the trial judge. *See, e.g., State v. Anderson, supra,* wherein a question concerning the defendant's immoral conduct with a woman relative was permitted in a robbery trial. However, in this case we need not decide whether the questions would have been proper. The questions were disallowed by the trial judge and the jury was instructed to disregard them. We have held this to be sufficient to cure any error involved in asking the questions. *State v. McMullen,* 142 Wash. 7, 252 P. 108 (1927).

### Manslaughter Instruction

█ The sixth and final assignment of error involves the refusal of the trial court to give a manslaughter instruction. The defendant is not entitled to such an instruction where there is no evidence indicating that the killing was unintentional or without the design to effect the death of the victim. In the instant case we are convinced there was no such evidence. Consequently, such an instruction would

have been confusing and should not be given. *See ,State v. Moore,* 61 Wn.2d 165, 377 P.2d 456 (1963), and cases cited therein.

The judgment is affirmed.

HUNTER, C. J., HALE and NEILL, JJ., concur.

HAMILTON and STAFFORD, JJ., and HILL, J. Pro Tem., concur in the result.

ROSELLINI, J. (concurring in the result)—I concur in the result and agree that the deputy prosecutor's surreptitious action in obtaining a copy of the psychiatrist's report was not prejudicial to the appellant. However, I do not concur in the dictum concerning the efficacy of the rule excluding, in a proper case, evidence wrongfully obtained. The authority cited for the criticism of the rule hardly rises to the dignity of precedent and I do not regard it as having more persuasive value than the opinions of the United States Supreme Court. The debate concerning the propriety of the exclusionary rule has raged for many years, and it seems to me that it should be grappled with only when a factual situation involving it is presented to the court. At such a moment there is at least a greater possibility that both sides of the question will be presented.

In *State v. Cory,* 62 Wn.2d 371, 378, 382 P.2d 1019 (1963), we held that where the conduct of the prosecutor seriously invades the constitutional rights of the defendant, the entire proceeding is vitiated. We approved the position taken by the California Supreme Court that the courts should not have any hand in the "dirty business" of obtaining evidence by illegal means, and that to allow the introduction of such evidence gives tacit approval to the procedure adopted in acquiring it.

We quoted the following from *People v. Cahan,* 44 Cal. 2d 434, 445, 282 P.2d 905, 50 A.L.R.2d 513 (1955):

We have been compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to par-

338

ticipate in, and in effect condone, the lawless activities of law enforcement officers.

Until *State v. Cory, supra,* is overruled, I believe it is the law in this jurisdiction and should not be clouded by dictum in another case in which the question is not before the court.

October 14, 1970. Petition for rehearing denied.

\*Reported in 474 P.2d 267.