[No. 41227.   En Banc.   September 30, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN THOMAS MUSIC, *Appellant*.

*John M. Watson* and *John R. Miller,* for appellant (appointed counsel for appeal).

*Christopher T. Bayley, Prosecuting Attorney, Philip Y. Killien* and *Stuart A. Cohen, Deputies,* for respondent.

FINLEY, J.—This is a first-degree death-penalty murder case. Appellant's grounds for appeal, seeking a new trial, are discussed separately and at some length hereinafter.

We find no reversible error in appellant's grounds for appeal. Accordingly, we deny his claim for a new trial; we affirm the judgment and the sentence entered by the trial court, the jury's verdict of guilty and its imposition of the death penalty.

On the evening of January 17, 1969, Traice Walters, 15 years of age, was fatally shot twice in the back with a .22 caliber rifle as he attempted to get away from four youths in an automobile who had pulled alongside of him and his companion Robin Mills, age 16, on a city street in Seattle. The murder of Traice Walters was, apparently, the culmination of a series of prior events and crimes perpetrated by the above-mentioned youths on January 17. At the time of his trial, appellant John Music was 19 years old. He had been in and out of numerous juvenile institutions for one-half of his life, and, since the age of 12, had been a constant and heavy user of narcotic drugs.

The above events of January 17 are described from the record in further detail as follows: at an undetermined time during the day, appellant Music and three other youths—Van Rush, Withrow, and Weaver—met in the apartment of the latter two. They proceeded to drink wine, whiskey and beer, in addition to smoking marijuana. While so engaged, the four discussed the need to obtain rent money and some additional "crank."

Sometime in the early evening, the four youths left the apartment—armed with Weaver's rifle, which was in the appellant's possession. At approximately 9 p.m., as she entered her automobile in the parking lot of the Seattle Northgate Shopping Center, Martha Beaton was confronted by four youths in another car, one of whom aimed a rifle in her direction. Mrs. Beaton was commanded to surrender her money. However, she informed her assailants that she had neither a purse nor any money. The vehicle and its occupants then departed from the parking lot. Mrs. Beaton later identified appellant Music, at a police lineup, as one of the occupants of the vehicle.

Shortly after 9 p.m., Melvin McCoy was similarly ac-

costed, in front of his north end Seattle residence, by four young men in an automobile who demanded his money. Mr. McCoy stated to the four that he had no money. Following an examination of his empty wallet by one of the four, the vehicle sped away. McCoy also identified appellant Music, at a subsequent police lineup, as one of the vehicle's occupants.

Traice Walters and Robin Mills—ages 15 and 16 respectively—were walking in the vicinity of Shoreline High School at approximately 9:30 p.m. on the evening of January 17. An automobile containing four youths suddenly pulled up and stopped along side of the two boys. Traice Walters looked at the vehicle and, apparently frightened by what he saw, he began to run away.

An individual in the automobile shouted at Traice—commanding him to bring back his black leather jacket. Not heeding this command, Traice continued to run; and, when he was some 15 to 20 feet from the vehicle, one of the vehicle's occupants suddenly fired at Traice, striking him twice.

Immediately thereafter, Robin Mills was robbed of his own leather jacket at gunpoint. At trial, Robin identified appellant Music as the individual who fired at Traice Walters and who took Robin's jacket at gunpoint.

Following these events, the vehicle and its four occupants sped away. Traice Walters was taken to the house of a neighbor. He was later admitted to a Seattle hospital, suffering from two gunshot wounds—one in the upper chest and another in the back. Traice subsequently expired from a combination of shock, respiratory failure, and cardiac arrest, resulting from the gunshot wounds.

At approximately 10:30 p.m. that evening, Clarence Rickard and Ruby Hughes were accosted in the parking lot of an Edmonds apartment by three youths who took Rickard's car keys and billfold at gunpoint. The youths then fled in Rickard's automobile. Ruby Hughes subsequently identified appellant Music as one of the three individuals who had accosted her and Rickard in the parking lot.

Later the same evening, a police chase, culminating in the crash of Rickard's vehicle, resulted in the apprehension of three of the four youths, including appellant Music.

The appellant was charged by amended information with one count of robbery and three counts of attempted robbery. He was additionally charged with the first-degree murder of Traice Walters by virtue of the felony-murder rule—RCW 9.48.030(3). Two of the other three youths, Withrow and Weaver, were similarly charged. The fourth youth, Van Rush, was initially processed as a juvenile offender.

Prior to trial, Withrow and Weaver were allowed to plead guilty to murder in the second degree and did not go to trial in the instant case. However, both men testified as witnesses for respondent state at appellant Music's trial.

It may be noted at the outset that appellant's guilt of the crimes charged was not substantially disputed at trial. Appellant's 17 assignments of error—which will be discussed individually hereinafter—center principally upon challenges to the fairness of his trial, and to the legal sufficiency of the evidence to support his conviction on the charge of attempted robbery of Traice Walters.

■ Appellant first contends that four potential jurors were improperly excluded by the trial court because of their opposition to capital punishment, contrary to the dictates of *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968). *Witherspoon* dictates that states may not exclude as jurors in capital cases, persons who voice *general objections* to imposition of the death penalty, or who express conscientious or religious scruples against its infliction.

The Witherspoon standard does *not* prohibit a state from excluding veniremen who indicate that they can *never* vote to impose the death penalty. Rather, the standard is framed in the following terms:

> We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen

who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.

*Witherspoon*, 391 U.S. at 522 n.21.

In *Hawkins v. Rhay*, 78 Wn.2d 389, 397, 474 P.2d 557 (1970), we stated:

[I]n meeting the demands of *Witherspoon*, as well as our prior holdings, it [is] not necessary to engage in a formulistic dialogue with a prospective juror on voir dire examination. Nevertheless, we endeavored to emphasize the proposition that before a prospective juror is disqualified for cause due to his beliefs with regard to capital punishment, it is essential that such dialogue as is carried on in this respect be sufficient in depth and/or in a context as will unequivocally and unmistakably establish that the prospective juror's opposition to the death penalty is in fact such as would preclude him from imposing that penalty under any circumstances, or would prevent him from making an impartial determination upon the issue of guilt.

We have scrutinized that portion of the instant record containing the trial court's voir dire examination of prospective jurors. From this, we are convinced beyond any doubt that those prospective jurors who were excused because of their opposition to the death penalty, were so excluded only after the trial judge had fully and rigorously complied with the Witherspoon standard.

The trial court's preliminary examination of prospective jurors included the following query:

The question now is, can the jurors now in the box vote in favor of the death penalty if they should feel satisfied beyond a reasonable doubt of the defendant's guilt of murder in the first degree? Could they now, if they thought the facts warranted, vote that capital punishment should be imposed; *and, conversely, if an answer "no" would mean that they could not imagine any*

*set of facts that would permit them to vote in favor of capital punishment. Is there anyone that is so constituted that they could not, under any circumstances, vote for the death penalty?*

(Italics ours.) Additionally, the trial judge carefully and specifically examined each prospective juror who so stated an opposition to the death penalty. Only after fully determining that such jurors could, under no set of circumstances, vote to impose the death penalty, did the trial court excuse such jurors for cause.

We reiterate our statement expressed previously in *Hawkins v. Rhay, supra,* that the Witherspoon standard, as we view it, imposes no rigid, formulistic or stock set of questions which must be asked of a given prospective juror who voices opposition to imposition of the death penalty *before* such juror can be excluded for cause. The principle embodied in *Witherspoon* envisions a general, guiding norm of philosophical disposition—the existence or nonexistence of which will either qualify or exclude an individual from serving as a juror in a capital case. That norm was clearly met and applied by the trial court in the instant case. Appellant's objection is without merit.

Appellant next raises three related constitutional challenges to the death penalty; *viz.,* (1) that this state's single verdict system providing simultaneous submission to the jury of the two issues of guilt and punishment denies capital defendants a fair trial; (2) that the jury's function in choosing, without guidelines, between imposition of life imprisonment or the death penalty violates the fourteenth amendment to the United States Constitution and Const. art. 1, § 3; and (3) that imposition of the death penalty constitutes cruel and unusual punishment in violation of the eighth amendment to the United States Constitution.

First, we shall examine appellant's first two contentions. In this regard, our recent comments in *State v. Cerny,* 78 Wn.2d 845, 854, 480 P.2d 199 (1971), are relevant:

Appellant's next two assignments of error are closely related and may be considered together; *viz.,* that the

trial court erred by allowing the jury to choose between life imprisonment and the death penalty without guidelines or standards on which to base such a choice; and that the trial court erred by following this state's single verdict system of submitting simultaneously to the jury the two distinct issues of guilt and punishment. These contentions have been extensively considered by this court previously in *State v. Smith*, 74 Wn.2d 744, 446 P.2d 571 (1968). Therein, we held that RCW 9.48.030, which permits the jury to make a special finding imposing the death penalty in first-degree murder cases, is not unconstitutional and invalid on the ground that it fails to provide standards to guide the jury in determining whether the death penalty should be imposed. Additionally, that case held the statutory procedure requiring simultaneous submission of the issues of guilt and of imposition of the death penalty in a first-degree murder case, and the resulting requirement that evidence on both issues be presented before a decision on either one, are not constitutionally defective.

Nothing is presented in the instant case to persuade us that the holdings of *Smith* should be overruled.

We further noted in *Cerny* that both issues were then under consideration by the United States Supreme Court. That court, in *McGautha v. California*, 402 U.S. 183, 28 L. Ed. 2d 711, 91 S. Ct. 1454 (1971), has subsequently decided both issues contrary to appellant's position. The *McGautha* opinion states, in relevant part:

In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammelled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution. The States are entitled to assume that jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel.

(Footnote omitted.) *McGautha v. California*, 402 U.S. at 207. The court further held:

The criminal process, like the rest of the legal system, is replete with situations requiring "the making of diffi-

cult judgments" as to which course to follow. *McMann* v. *Richardson,* 397 U. S. 759, 769 (1970). Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved. *Analysis of this case in such terms leads to the conclusion that petitioner has failed to make out his claim of a constitutional violation in requiring him to undergo a unitary trial.*

(Italics ours.) *McGautha v. California,* 402 U.S. at 213.

We adopt the result reached in *McGautha* and reaffirm our earlier decisions in *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968) and *State v. Cerny, supra,* that the unitary trial system and the absence of guidelines do not invalidate jury imposition of the death penalty.

■  The constitutionality of capital punishment, against the challenge that such penalty amounts to cruel and unusual punishment was exhaustively discussed in *State v. Smith, supra.* Therein, we found, after a detailed examination of relevant authorities, that such an argument is not supportable. We concluded:

> These are all arguments which should be addressed to the legislature, and which have prevailed in the legislatures of a number of states.

(Footnote omitted.) *State v. Smith,* 74 Wn.2d at 778. We note that this issue is presently before the United States Supreme Court. However, we are presently disposed to reaffirm the reasoning and result expressed in the *Smith* decision.

■  Appellant next contends that RCW 10.49.010—which provides that criminal defendants charged with the crime of murder may not waive a trial by jury—violates such defendants' right to equal protection under the fourteenth amendment to the United States Constitution. That statute provides:

> If, on the arraignment of any person, he shall plead guilty, *if the offense charged be not murder,* the court

shall, in their discretion, hear testimony, and determine the amount and kind of punishment to be inflicted; *but if the defendant plead guilty to a charge of murder, a jury shall be impaneled to hear testimony, and determine the degree of murder and the punishment therefor.*

(Italics ours.)

Appellant argues that the above statute denies a criminal defendant charged with murder the opportunity to waive a jury trial if he believes that he will receive better treatment before a judge. Thus, he contends, the statute is violative of his right to equal protection. We do not agree. This issue has been previously considered and resolved by this court. We adhere to that reasoning in the instant case:

> Appellant's arguments, if accepted, would result in the elimination of the death penalty because, under our statutes, only the jury can find that the death penalty shall be imposed. The basic constitutional right which requires protection is the *right* to *have* a trial by jury, and the states are required to protect and promote that right. *Duncan v. Louisiana*, 391 U.S. 145, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968). We fail to see how a statute which has the effect of extending and preserving that right can simultaneously be considered an invidious discrimination and consequently a violation of the Fourteenth Amendment.
>
> Indeed we are convinced that the classification adopted by the aforementioned statutes is a reasonable one. As the United States Supreme Court said in *Witherspoon v. Illinois*, 391 U.S. 510, 521, 20 L. Ed. 2d 776, 784, 88 S. Ct. 1770 (1968), the determination made by a jury in a capital case "is different in kind from a finding that the defendant committed a specified criminal offense." We believe that this difference in kind is sufficient to support the statutory scheme requiring jury trial in capital cases.

*State v. Baker*, 78 Wn.2d 327, 334, 474 P.2d 254 (1970).

Appellant next assigns error to certain instructions given by the trial court. He first alleges that the trial court erred in giving instruction No. 24, and in failing to give either appellant's proposed instruction No. 9 or respondent's *proposed* instruction No. 24. Instruction No. 24, *as given by the court,* set forth the accepted test for determination of

whether appellant possessed sufficient mental capacity—at the time of the commission of the alleged crimes—to comprehend what he was doing and to distinguish right from wrong with relation to his acts.

Appellant's proposed instruction No. 9 was an effort to explain to the jury the consequences of a verdict of not guilty by reason of insanity or mental irresponsibility. That proposed instruction read:

If you find that the defendant is not guilty by reason of mental irresponsibility and that such mental condition still exists, or that because of the likelihood of relapse or recurrence the defendant is unsafe to be at large, you are instructed that what will be done with the defendant will be as follows:

(1) The court will order the defendant committed as a criminally insane person.

(2) A person so committed can never be discharged except upon the order of a court of competent jurisdiction made after a trial and judgment of discharge.

(3) An order of discharge may be entered only after a trial before a jury in the court of the county that committed him and only in the event such defendant be therein found by the jury to be a safe person to be at large.

Similarly, respondent's proposed instruction No. 24 was directed at informing the jury as to the effect of a decision not to impose the death penalty. As such, the instruction informed the jury regarding the function of the Board of Prison Terms and Paroles, and further informed the jury regarding the method for computation of minimum sentences. Respondent's proposed instruction was an expansion upon a similar instruction discussed in *State v. Todd,* 78 Wn.2d 362, 474 P.2d 542 (1970). Admittedly, respondent's proposed instruction No. 24 attempted to overcome the shortcomings of the instruction considered in *Todd.* As such, the instruction presented a balanced explanation of the consequences of a sentence of life imprisonment.

However, both proposed instructions, in our judgment, suffer from the same vice which convinces us that the trial court was correct in refusing their adoption:

> This argument . . . leads us to what we consider the most serious vice of an instruction of this kind. It sets a standard where none has been set by the legislature and thus places *undue emphasis* upon one factor which the jury, whether or not it should do so, is bound to take into account. All other factors come before the jury in the form of evidence or of their own experience and knowledge. By instructing the jury concerning the possible minimum sentence which the defendant might serve, the court suggests to the jury that it should give great weight to that possibility in reaching its verdict.

*Todd,* 78 Wn.2d at 376. It is obvious that appellant's proposed instruction No. 9—relating to the consequences of a verdict of not guilty by reason of mental irresponsibility— suffers from the same type of defect as that described in the *Todd* opinion.

In light of our earlier discussion regarding the constitutional validity of allowing the jury to impose the death penalty absent set or specific standards, we must conclude that the trial court was correct in refusing both instructions. Were we to hold otherwise, we would be setting a *judicial standard* where "none has been set [*or intended*] by the legislature." The provision of punishment for social offenders is a question uniquely within the province of the legislature:

> But when it comes to the imposition of the death penalty, the legislature has seen fit to make that question hinge upon a further fact to be found by the jury—how deeply has the defendant offended the community?

*Todd,* 78 Wn.2d at 375.

Appellant additionally excepts to the trial court's giving of instruction No. 6, defining the crime of attempted robbery. He argues that the instruction failed to define adequately for the jury the necessary elements of attempted robbery. Appellant further asserts that the entire instruction was improperly given since there was an absence of substantial evidence to support the charge that appellant attempted to rob the decedent, Traice Walters.

The crime of attempt consists of two elements; *viz.,*

(1) criminal intent, and (2) an overt act. We find no error in the *form* of the trial court's instruction. As presented, the instruction was, nearly, a verbatim recitation of RCW 9.01.070, which defines the crime of attempt.

Further, we are unable to agree with appellant's contention that respondent state failed to prove the *second element* required to sustain the charge of attempted robbery; *i.e.*, an overt act. The record shows that, immediately prior to the shooting, appellant had commanded the decedent to return and hand over his leather jacket. It is patently obvious that the jury could have concluded the pointing of a firearm and its discharge in the direction of decedent—the object of an attempted robbery—constituted overt acts directed toward commission of a robbery.

Beyond this, in light of other evidence introduced at trial concerning previous and subsequent activities of the appellant, we think the jury could have concluded that the incident resulting in the death of Traice Walters was part of a common scheme or plan on the part of appellant and his companions to commit robberies on the day in question.

Appellant next assigns error to the trial court's admission of certain evidence concerning his prior criminal conduct. During the respondent's cross-examination of appellant's psychiatrist, respondent was permitted to establish that appellant Music had committed two armed robberies 6 days prior to the evening of January 17. Additionally, appellant's psychiatrist testified that the appellant had stated—on four separate occasions—he would kill a police officer with a gun.

We must reject appellant's contention that such testimony constituted error. Once a criminal defendant raises the defense of mental irresponsibility, all of his past conduct becomes admissible. The clear rule in such cases, most recently restated in *State v. Collins,* 50 Wn.2d 740, 759, 314 P.2d 660 (1957), is that:

"... *any and all conduct* of the person is admissible in evidence. There is no restriction as to the kind of conduct. There can be none; for if a specific act does not indicate insanity it may indicate sanity." 2 Wigmore on

Evidence (3d ed.) 9, § 228, quoted in *State v. Odell* (1951), 38 Wn. (2d) 4, 20, 227 P. (2d) 710.

Appellant next excepts to the admission of certain exhibits at trial. He objects to the admission of exhibits 39 and 40—the decedent's alleged T-shirt and black knit sweater—on the ground that the identifying witness was not present when said articles of clothing were removed from the decedent. The ownership of these items had been related to the identifying witness by a physician at the hospital.

Appellant further argues that admission of these exhibits —consisting of the decedent's bloody clothing—had no probative value, and served only to inflame the jury against the appellant.

■■ We find no merit in either contention. Appellant failed to make timely objection to the admission of these exhibits. Where timely objection to the admission of hearsay evidence is not made, said evidence will not constitute the basis for reversible error. *State v. Naples*, 51 Wn.2d 525, 319 P.2d 1096 (1958). Additionally, we have held that, where physical evidence taken from a murder scene is not positively identified, such fact goes to the weight, rather than to the admissibility of such evidence. *State v. Bauman*, 77 Wn.2d 938, 468 P.2d 684 (1970).

Furthermore, the instant record fully supports the relevance of these exhibits. Entrance locations of the bullet holes in decedent's clothing established the path of the fatal bullets, and thus laid the foundation for subsequent testimony of respondent state's ballistics expert.

Appellant also assigns error to the trial court's admission of exhibits 28 and 29—the alleged clip and cartridge from the murder weapon. Appellant asserts that respondent state failed to establish an unbroken chain of custody with regard to these exhibits. In our opinion, an examination of the record indicates ample evidence to support the propositions (1) that the murder weapon removed from the automobile in which the appellant was apprehended contained a clip and cartridge; and (2) that exhibits 28 and 29 were

the same clip and cartridge contained in said murder weapon.

There is no indication whatsoever in the record that these exhibits were altered either as to identity or condition. While the identity and condition of an exhibit are always subject to rebuttal, it is not necessary for the admitting party to negate *every* possibility of tampering with an exhibit. *State v. Russell,* 70 Wn.2d 552, 424 P.2d 639 (1967).

Appellant next assigns error to the trial court's refusal of his motion seeking production of a report prepared by Detective Leaf of the King County Sheriff's Office. Said report consisted, in part, of Detective Leaf's activities in connection with the previously discussed exhibits 28 and 29.

Appellant argues that he was entitled to the production of Detective Leaf's report pursuant to an order previously entered by the King County Superior Court, requiring the production of all statements by witnesses in the case. We do not agree. The trial court was correct in ruling that Detective Leaf's written statement was an "investigative report." As such, the detective's report was not within the scope of the previous order requiring production of witnesses' statements.

A criminal defendant is not entitled, as a matter of right, to inspect any documents made by prosecution witnesses; and, the granting of discovery in criminal cases is a matter within the sound discretion of the trial court. *State v. Tyler,* 77 Wn.2d 726, 466 P.2d 120 (1970); *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968); *State v. Mesaros,* 62 Wn.2d 579, 384 P.2d 372 (1963); *State v. Robinson,* 61 Wn.2d 107, 377 P.2d 248 (1962); *State v. Thompson,* 54 Wn.2d 100, 338 P.2d 319 (1959).

Appellant next challenges certain actions by the prosecutor during the course of the trial. After appellant had rested his case-in-chief, he was subsequently permitted to reopen his case so that he might have a further opportunity to demonstrate his feelings and beliefs regarding the value of human life.

Following appellant's direct examination upon the reopening, the prosecutor and appellant engaged in the following colloquy:

Q [By the prosecutor] Would you be surprised to learn my mother died when I was thirteen?

A [By the appellant] No.

Q Would it surprise you to learn that at thirteen I was running in the streets?

    MR. CHURCH [defense counsel]: I object—this is without foundation.

    THE WITNESS: It wouldn't surprise me at all, because maybe anything can happen.

Q (By [the prosecutor]) Would it surprise you to know I also have a tattoo (removing coat to show tattoos on arms)?

A No, it wouldn't surprise me. It wouldn't surprise me to learn that you spent fifteen years in the penitentiary. It wouldn't surprise me at all, because maybe you got the help you needed.

Q Would it surprise you to know I helped myself?

A No.

Q Do you want to know how Traice Walter's father feels?

A Yes, I would.

After redirect examination by appellant's trial counsel, the prosecutor first called the decedent's father to the stand, and then stated: "We won't call Mr. Walters."

Appellant argues that the prosecutor's statements and actions amounted, in effect, to an improper interjection by the prosecutor directed at the jury, that "if I [the prosecutor] suffered all those abuses and came through, why then hasn't the defendant also been able to make something of himself?" Respondent state, contrariwise, argues that the prosecutor's remarks were not inappropriate since appellant was allowed to reopen his case-in-chief to show his feelings regarding the value of human life. Respondent further argues that it had the right to show appellant's conditions were not an excuse for his crimes.

    We must conclude that the prosecutor's above-described comments and actions constituted highly improper,

totally unwarranted and clearly unprofessional conduct. It is patently obvious that an attorney is, generally, incompetent to testify in behalf of a cause which he is trying. Further, since the prosecutor was not under oath at the time of his questions, his assertions constituted the clearest form of unsubstantiated hearsay.

However, it is not dispositive to conclude that the prosecutor's remarks were improper. The question to be resolved is whether there is a substantial likelihood that such questions affected the jury's verdict and, thus, deprived the appellant of his right to a fair and impartial trial. Viewed in this perspective, we are unable to conclude that the questions had the probable effect of swaying the jury's verdict.

It may be noted that, in the course of respondent's closing argument, it would not have been improper for the prosecutor to suggest to the jury that the appellant's prior conditions could provide no excuse for his alleged crimes. Viewed in the proper perspective of the entire record, we must conclude that the prosecutor's actions—although improper—did not result in prejudicial error.

Appellant next assigns error to the trial court's admission of certain statements attributed to the decedent, Traice Walters, following the shooting. The witness, Mrs. Swett, observed Traice Walters when he was taken to her home following the assault. Mrs. Swett testified that the victim told her "I'm dying . . . I don't want to die." Appellant made no objection to the witness' remarks. It is apparent from the record that Mrs. Swett's statement was not intentionally elicited as a deliberate attempt to inflame the jury.

It is probable that appellant's trial counsel chose not to object to the witness' statement as deliberate trial strategy. We are not now prepared to second-guess the actions of appellant's trial counsel. We are convinced that the above-quoted statement—in the context of the voluminous record —produced no prejudicial error to the appellant.

Appellant Music further asserts that he was denied a fair trial as the result of various actions by the

presiding department of the King County Superior Court. These actions include the denial of appellant's motions for stay of proceedings, change of venue and continuance. The grant or denial of all such motions rests within the sound discretion of the trial court. We have carefully examined the instant record and can find no abuse of discretion in the denial of these motions. *State v. Smith*, 74 Wn.2d 744, 446 P.2d 571 (1968); *State v. Bailey*, 71 Wn.2d 191, 426 P.2d 988 (1967); *State v. Moe*, 56 Wn.2d 111, 351 P.2d 120 (1960).

Appellant next challenges the trial court's finding that he was competent to assist in his defense and to stand trial. At the hearing below, evidence as to appellant's competency was disputed. Respondent state's psychiatrist unequivocally testified that his examination of appellant revealed him to be competent to assist in his defense and to stand trial. Testimony offered by the appellant's psychiatrist was, on the other hand, equivocal. In this state, it is the duty of the trial court to ascertain and determine the competency of a criminal defendant to stand trial. *State v. Thomas*, 75 Wn.2d 516, 452 P.2d 256 (1969). We find no error in the trial court's determination regarding appellant's competency.

Remarks of the prosecutor during his closing argument are the basis of an additional assignment of error by the appellant. The prosecutor's closing argument included, *inter alia*, the following statements:

> We know that the defendant has threatened police officers. It is sort of a mad dog Music, "you will never take me alive" sort of feeling that you get, like James Cagney in a movie.
>
> . . .
> . . . and generally the peer influence is such that four punks in a car will generally go where everybody else wants to go in the car.
>
> . . .
> Who was John Music? . . . Who speaks for him. This is a capital case. One would think that there would be a parade of witnesses to the stand to tell us about Music, to tell us, well, he is just a crazy mixed-up kid. . . . There is nobody here to tell you that, and people should

be here to tell you that. So, I am going to write: Nobody speaks for him. There should be somebody. Apparently there isn't.

This court does not sanction such pejorative characterizations and impassioned rhetoric:

> That the foregoing statements of the prosecutor constituted reprehensible conduct is without dissent. We have stated on prior occasions, and we reassert, that a public prosecutor is a quasi-judicial officer. He represents the state, and in the interest of justice must act impartially. His trial behavior must be worthy of the office, for his misconduct may deprive the defendant of a fair trial. Only a fair trial is a constitutional trial. *State v. Case,* 49 Wn.2d 66, 298 P.2d 500 (1956).

> We do not condemn vigor, only its misuse. When the prosecutor is satisfied on the question of guilt, he should use every legitimate honorable weapon in his arsenal to convict. No prejudicial instrument, however, will be permitted. His zealousness should be directed to the introduction of competent evidence. He must seek a verdict free of prejudice and based on reason.

*State v. Huson,* 73 Wn.2d 660, 663, 440 P.2d 192 (1968).

Nevertheless, as we noted in *Huson,* an improper argument to the jury, although reprehensible, does not necessarily constitute reversible error. We stated in *Huson* that the adverse party may, legitimately, have chosen to waive objection to such remarks as a matter of trial strategy. Therein, we commented:

> Testing the referenced statements in the light of the record in this case, we find: (1) that defendant's trial counsel is a highly competent, experienced criminal trial attorney; (2) that at no stage of the proceedings did he make objection to the remarks attributed to the prosecutor; (3) that the opportunity for objection was constantly available; (4) that no curative instruction was requested.

*Huson,* 73 Wn.2d at 663.

Similarly, in the instant case, we are unable to conclude that the prosecutor's remarks during the course of his closing argument to the jury resulted in prejudicial error to the appellant. The record indicates that defense counsel, while

aware of the remarks of the prosecutor, interposed no objection to them. Furthermore, to paraphrase the test of *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), we are convinced beyond a reasonable doubt that with or without the remarks of the prosecutor the jury would have reached the same result. We are thus satisfied that the prosecutor's remarks—albeit reprehensible and improper—do not constitute reversible error.

Finally, appellant claims error in the trial court's denial of his motion for new trial, and in the trial court's entry of judgment and sentence on the two counts from which this appeal is taken. He asserts that, even if the foregoing errors are not independently prejudicial, they are, nevertheless, matters of "dubious propriety," depriving him of a fair trial. *State v. Bromley*, 72 Wn.2d 150, 432 P.2d 568 (1967). We must disagree.

The test for setting aside the verdict of a criminal jury is clearly established:

> [T]he verdict of the jury in a criminal case will be set aside and a new trial granted to the defendant, because of an error occurring during the trial of the case, only when such error may be designated as prejudicial. . . .
>
> A prejudicial error may be defined as one which affects or presumptively affects the final results of the trial. . . . When the appellate court is unable to say from the record before it whether the defendant would or would not have been convicted but for the error committed in the trial court, then the error may not be deemed harmless, and the defendant's right to a fair trial requires that the verdict be set aside and that he be granted a new trial. *But, where the defendant's guilt is conclusively proven by competent evidence, and no other rational conclusion can be reached except that the defendant is guilty as charged, then the conviction should not be set aside because of unsubstantial errors.* 5 Am. Jur. 2d *Appeal and Error* § 786 (1962). To determine whether prejudice has resulted, it is necessary that the appellate court examine the entire record.

(Citations omitted. Italics ours.) *State v. Martin*, 73 Wn.2d 616, 627, 440 P.2d 429 (1968).

Upon thorough, independent examination of the entire record, and in light of our previous discussion, we are unable to find the commission or occurrence of prejudicial reversible error during the trial of appellant.

It may be noted in summary that, quite possibly, appellant's trial counsel faced an all but impossible task. Appellant's guilt in relation to the crimes charged was not seriously open to question. It is difficult to imagine a more callous or shocking commission of murder. And, it is apparent, both at trial and upon the instant appeal, that appellant's counsel could, realistically, hope at best to achieve the sparing of appellant's life.

Nevertheless, the legislature has prescribed two alternative sanctions which may, in the sole discretion of the jury, be imposed for the conviction of murder in the first degree. We are bound to give effect to such legislative prescription. This court cannot in good conscience, under the guise of appropriate and legitimate appellate review, magnify harmless error into error of prejudicial, reversible proportions, for the purposes of affording the appellant a "second attempt" to avoid the death penalty. We can only conclude, on the record before us, that appellant was afforded his full constitutional rights to a fair and impartial trial.

The judgment is affirmed.

HAMILTON, C.J., ROSELLINI, HUNTER, HALE, NEILL, STAFFORD, SHARP, and WRIGHT, JJ., concur.

Petition for rehearing denied December 2, 1971.