[No. 36830. Department One. November 7, 1963.]

THE STATE OF WASHINGTON, *Respondent*, v. ERVIN RAY, *Appellant*.*

*H. Frank Stubbs*, for appellant.

*John G. McCutcheon, S. J. Witt*, and *Thomas M. Baker, Jr.*, for respondent.

HALE, J.—Defendant, charged in count 1 of the amended information with the attempted rape of one Ann F——— on April 16, 1961, and in count 2 with the rape of one Viola D———, appeals the judgment of conviction on each count. He challenges the sufficiency of the evidence on each count to sustain his conviction on the precise charges set forth in the information. We will study the two counts individually.

Ann F———, a widow, employed as a practical nurse in a nursing home in Tacoma, was ironing in a small room off of the kitchen when, at about 3 a.m., April 16, 1961, she

*Reported in 386 P. (2d) 423.

was startled ·by a man standing in the hallway, going through the motions of rubbing the wall with two dish towels as though he was cleaning the wall. He came toward her, and she backed away. He tried to get the dish towels over her head; she ran upstairs into a patient's room. He followed, grabbed her, choked her, and threw her onto the bed and then onto the floor. She screamed several times and lost consciousness fleetingly. He dragged her out of the room and downstairs, choking her with his hands; then, as she struggled, he forced her out of the front door of the home into the yard—all the while choking and dragging her—and threw her to the ground by the hedge and grappled with her on the ground. Suddenly he jumped up from her, and, as though listening for something, peered through the hedge. Thus released, Ann F———— ran into the nursing home and called the police. Evidence identifying the defendant as the attacker was sufficient; but does it show attempted rape prima facie? Forced to concede a prima facie case of assault, or perhaps even assault with intent to commit rape, defendant asserts that the evidence falls short of making a prima facie case of attempted rape and relies on the ambiguity of her testimony on this point.

"Q. Did he say anything while this was going on? A. Yes, he said something to me. Q. What? A. I can't repeat it. So, anyhow, he brought me up to this hedge and he knocked me down, and he had ahold of my throat all the time, and was kind of opening the—the zipper stuck. Q. Which zipper? A. His pants. And I couldn't scream, because my ears—my ears—my head—and I knew I was dying, and he—all at once—I don't know how long he was trying, I could not remember, but I knew that it was my last, but I screamed. He let go a minute and I screamed as loud as I could again, and then in the meantime— Q. This was while you were on the ground? A. Yes, uh-huh; . . . Q. While you were on the ground there did he ever touch any portion of your body? A. He tried to get at my—he got—I don't know. He must have raised up my dress, because, well, it was just something, because I couldn't—I was trying to get my breath. He had his hands, you know, and stooping down. Q. Now, while you were outside, I will ask you whether or not he told you what his intentions

were. A. Yes. On the—he said, you holler again and I will strangle you right here, or I will kill you, I don't remember whether he said kill, or strangle you right here. Q. While you were outside did he ever tell you about anything else that he proposed to do to you? A. Well, he told me what he was going to do, and then he was going to strangle me, because I had a good look at him. He said, you holler once more and I will strangle you right here. Q. Now, you answered in response to one of my previous questions that you couldn't repeat what he said. A. Yes. Q. Why do you say you can't repeat that? A. Well, I don't like to repeat it. Q. Just because you are embarrassed? A. Yes. Q. May I ask you whether or not he indicated to you at that time that he proposed to have intercourse with you? A. Yes."

At the close of the case, appellant moved to dismiss for failure to make a prima facie case as to the precise charge in count 1, and after verdict in arrest of judgment moved for a new trial. He assigns error to the denial of these motions and to entry of judgment and sentence on the verdict.

 Forced by the undisputed evidence to concede proof prima facie of both an assault and an intent, appellant says that the two elements combined do not constitute an attempt. He points to the lack of the one essential ingredient as a fatal defect in making the described actions an attempt to rape—the overt act toward physical penetration. We are not disposed to indulge in hair-splitting subtleties by a holding that the acts of defendant constituted preparation with intent only. From the evidence, the jury could well have found so many overt acts tending directly toward consummation of the rape as to place the question beyond argument. The beating, choking, dragging, grappling, throwing upon the ground, disturbing the clothing, the unzipping of the trousers—all were overt acts toward assault, and, coupled with an avowed purpose to have sexual relations with the victim against her will, constituted overt acts toward the rape. *State v. Leach*, 36 Wn. (2d) 641, 219 P. (2d) 972.

We find that *State v. Meyer*, 37 Wn. (2d) 759, 226 P. (2d) 204, where want of consent was imported from the mental

incompetence of the prosecutrix, has no application here. There, any penetration, however slight, would have constituted rape because of the victim's mental and, therefore, legal inability to grant consent, and no fear, force or violence was involved. The impotence of the defendant saved him from a conviction because the preparation did not lead to consummation. No amount of preparation in the absence of a present ability to complete the act constituted an attempt.

We find no error in the trial court's refusal to dismiss count 1 and in imposing judgment and sentence on the verdict.

This takes us to a consideration of count 2, which charged the defendant with rape. Viola D———, a 62-year-old woman, was attacked as she walked from the bus to her home shortly before midnight on May 10, 1962. Her only recollection of the event is that she had been carrying her purse and shopping bag to the porch of her home when she was knocked unconscious. One witness, while peering through a window, heard screams and saw a man viciously kicking a woman and called the police. Officers Kelly and Otis of the Tacoma Police Department were three blocks away when they received the call and drove to the residence of Viola D———. They saw the victim's shopping bag near the porch of her home. Kelly got out to investigate and played his flashlight about the yard. As he shone it down the bank, the beam caught the scene of a woman laying on her back and a man on top of her; her legs were spread apart, her clothing was disarranged and pulled up to her abdomen. The man got up and ran, with Officer Kelly in pursuit. The policeman ordered the man to stop, fired one shot in the air and another shot toward the fugitive which failed to hit. The officer ran after the man, firing again at him as he sprinted. Officer Kelly says he lost sight of the suspect only once between the time his light picked him up and his capture—and that a period of not over 4 or 5 seconds when the defendant turned a corner ahead of him. Meanwhile, Officer Otis had driven the police car down an alley to intercept the fugitive. The man ran

behind the police car, but Officer Otis sprinted after him, caught him and grappled with him. In the struggle, they both fell to the ground. The police observed immediately upon arrest that the fly of the man's pants was open. The man caught in this pursuit was the defendant. His first statement, "Did you get those other guys that did it?" failed to move the officers.

The defendant was taken to the police station under arrest; his clothing was taken from him for laboratory examination.

Viola D——— was removed at once to St. Joseph's Hospital where she was seen in a semicomatose condition by Dr. Thomas A. Smeall. He noted that she had severe lacerations of the face, bones of the jaw were fractured, and her left ear was nearly completely evulsed. Her face and clothing were bloody and her body bore the marks of a vicious brutal beating. But the assignment of error goes not to the insufficiency of the evidence in identifying the defendant with the assault, but goes directly to the question of the sufficiency of the evidence to prove a completed rape.

■ Appellant urges that his conviction on count 2 must be set aside because of the state's failure to prove sexual penetration. He says, with undeniable logic, that, unless there is sufficient circumstantial evidence to warrant the jury in finding a penetration, the facts do not fit the charge and he will have been convicted of a crime not shown to have been committed. We agree with him that, to sustain a conviction on circumstantial evidence, the circumstances proved must not only be consistent with each other and with the hypothesis that the accused is guilty, but, in addition, must be inconsistent with any hypothesis or theory tending to establish his innocence. *State v. James*, 58 Wn. (2d) 383, 363 P. (2d) 116; *State v. Long*, 44 Wn. (2d) 255, 266 P. (2d) 797.

■ Our study narrows to a review of the evidence in the light of this rule on the fact of penetration. Any sexual penetration, however slight, is sufficient to constitute sexual intercourse or carnal knowledge under the criminal code: RCW 9.79.030. The act of sexual penetration, as with other

facts, may be proved by circumstantial evidence. *State v. Thorne*, 43 Wn. (2d) 47, 260 P. (2d) 331; *State v. Gay*, 82 Wash. 423, 144 Pac. 711; *State v. Biggs*, 57 Wash. 514, 107 Pac. 374.

Immediately upon the arrival of Viola D——— at the hospital, Dr. Thomas Smeall conducted a pelvic examination of her. He found she had:

" . . . minor, small, abrasive type lacerations of her vulva, which is the skin flap over the vagina; and she had a small laceration of the labia minora, which is the inner skin flap, and there was blood in the vagina; within the vagina."

The doctor answered other questions as follows:

"Q. As far as the small or minor, I believe you used the word 'lacerations' that you found, would it be possible to tell what the cause or what instrument, or what caused those marks? A. Well, any sort of a blunt object could cause such a— Q. Did these have the appearance of having been inflicted by a blow? A. No, there was no bruise with it, particularly. Q. Any blunt object? A. Yes."

Other circumstantial evidence relating to the fact of penetration came from examination of the blood specimen. Viola D——— proved to have type A blood. A blood spot on the shorts worn by the appellant at the time of his arrest likewise proved to be type A. It was also similar in type to blood spots found on the sleeve of defendant's jacket. The circumstantial evidence thus related in connection with all of the other evidence adduced on count 2 proved a sufficient basis for a finding by the jury of sexual penetration.

Judgment affirmed.

OTT, C. J., HILL, and ROSELLINI, JJ., and DAWSON, J. Pro Tem., concur.