[No. 41698.   En Banc.   March 30, 1972.]

THE STATE OF WASHINGTON, *Respondent*, v. GEORGE
MARION BOGGS, JR., *Appellant*.

*Jack E. Tanner* and *Donald H. McGavick*, for appellant (appointed counsel for appeal).

*Ronald L. Hendry*, Prosecuting Attorney, *Joseph D. Mladinov*, Special Counsel, and *Eugene G. Olson*, Chief Criminal Deputy, for respondent.

STAFFORD, J.—The defendant, George Marion Boggs, Jr., was charged with first-degree murder alleged to have been committed without design to effect death and while engaged in the commission of, or in the attempt to commit, or in withdrawing from the scene of a felonious rape.[1] Defendant admitted the killing, for which he could give no explanation, but denied raping or attempting to rape the victim. A jury convicted him of the first-degree murder and returned a special verdict imposing the death penalty. He appeals.

Defendant asserts that the state failed to prove either rape or attempted rape.[2] Thus, he claims, the trial court

---

[1] Defendant was also charged with first-degree arson. During the trial, however, he pleaded guilty to a reduced charge of second-degree arson.

[2] In pertinent part instruction No. 6 defined rape as follows:

"rape is an act of sexual intercourse with a female, not the wife of the perpetrator, committed against her will and without her consent.

"Every person who shall perpetrate such an act of sexual intercourse with a female of the age of 10 years or upwards, not his wife, when her resistance is forcibly overcome or prevented by fear of immediate great bodily harm which she has reasonable cause to believe will be inflicted upon her, shall be guilty of rape."

Although error is assigned to the giving of an instruction on the *subject* of rape, instruction No. 6 correctly reflects the *definition* of rape contained in RCW 9.79.010(2), (3), and no error has been assigned to that aspect of the instruction.

erred by failing to eliminate that element from five instructions related to the felony-murder charge.

We disagree.

There is substantial evidence to establish the following. The defendant had visited frequently in the victim's home. He knew that her husband worked nights and that her daughter was generally away during the evening hours.

On April 3, 1970, defendant attended a party with army friends, after which he and several others repaired to the private home of one of the group. From there defendant telephoned a young girl and invited her to join them. Thereafter, a friend drove him to the girl's home. On the way, defendant informed the driver that the whole company could have sexual intercourse with the girl. When they arrived at her home, she directed them to wait for her in the parking lot of a nearby church which was located approximately one block from the victim's home.

They drove to the parking lot, arriving about 8 p.m. While they waited, defendant continued to talk about sex. After a few minutes, he left the car to relieve himself and as he did so stated, in 4-letter words, that he intended to have sexual intercourse with "this old girl". At that point he disappeared and was not seen again that evening by the driver or the girl friend, who arrived a few minutes later.

She and the driver waited some time for defendant and when he failed to return, the girl suggested that they go to the victim's home in search of him. They found the lights and television set on, but no one answered the door and they departed.

Defendant's voluntary confession was admitted without objection at trial. He acknowledged having visited the victim's home and admitted that upon entering he found her fully clothed and apparently in good physical condition. The victim entertained him briefly and then excused herself to take a bath. Thereafter, defendant entered the bathroom where he strangled her with one of her stockings, and then carried her into the bedroom where he placed her on the bed and stabbed her in the neck with a letter opener.

He also told of setting fire to her home to conceal the crime.

Defendant testified similarly, except when asked whether he had had sexual relations with her, he stated: "I don't remember, sir. I don't recall it, no." Upon being asked whether he had attempted sexual intercourse after being refused, he replied, "No, sir." On this point it is of interest to note that a psychiatrist called as a defense witness was asked, on cross-examination, whether defendant had denied having sexual relations with the victim the night of the crime. He replied, "He denies *remembering* it". (Italics ours.)

There was evidence that the victim was found lying naked on the bed. Blood from both the neck wound and the genital area stained the bedspread. Fabric near the zipper of her blouse had been torn and the fastening device of her brassiere had been damaged. There was further evidence of a bite on her back and of a severe beating about the head and face.

Dr. Charles P. Larson, a board certified pathologist called by the state, testified about findings made during his autopsy of the victim's body. He explained fully why he concluded that she had been raped. The weight to be given such testimony was for the jury.

His testimony revealed that there had been tearing and hemorrhaging of the vaginal wall; that there had been penetration of the vaginal cavity by a blunt object such as fingers or forcible intercourse; that the wounds would have been excruciatingly painful because of inadequate lubrication of the organ. As he stated:

> we certainly think of rape occurring when we see these types of injuries, because if there had been consent there should have been lubrication and you wouldn't see these things under ordinary circumstances.

The doctor testified that he found a high concentration of prostatic fluid (a fluid ejected through the penis) in the vagina, which caused him to conclude that the vagina had been penetrated by a penis, although he could not establish the time. Based on the foregoing, he was of the opinion that

she had been raped although he acknowledged: "I'm not prepared to be a hundred per cent sure that you would call this rape . . ."

According to defendant's confession and testimony, the victim was alive and well when he entered the home. By the time he fled the home, however, he had strangled her, stabbed her in the neck, and set fire to the house to conceal the killing. The fire was discovered sometime thereafter and the victim was found in the condition described. Expert testimony disclosed that all of the above mentioned injuries occurred while she was still alive.

Granted, there is no direct evidence that defendant raped the victim. However, considering the totality of the evidence, including the testimony of Dr. Larson, there is strong circumstantial evidence from which the jury could have concluded that defendant raped her.

■■■■■ The act of sexual penetration, a necessary element of rape, may be proved by circumstantial evidence. *State v. Ray,* 63 Wn.2d 224, 228-29, 386 P.2d 423 (1963); *State v. Thorne,* 43 Wn.2d 47, 54, 260 P.2d 331 (1953). Whether circumstantial evidence establishing rape or the perpetrator thereof is consistent with guilt and inconsistent with any reasonable theory of innocence is a question for the jury. The scope of appellate review is limited to a determination of whether the state has produced substantial evidence tending to establish the circumstances from which the jury could reasonably infer the act or acts to be proved. *State v. Dugger,* 75 Wn.2d 689, 690, 453 P.2d 655 (1969); *see also* the discussion in *State v. Randecker,* 79 Wn.2d 512, 487 P.2d 1295 (1971). In so doing, the appellate court does not weigh the evidence, but merely examines its sufficiency. *State v. Dugger, supra.*

There being substantial evidence tending to establish both rape and its perpetrator, and the jury having been instructed on the use of circumstantial evidence, without error having been assigned thereto, the trial court properly submitted the issue of rape to the jury under the five instructions basic to the felony-murder charge.

■ A portion of the same assignment of error pertains to the trial court's instruction on "reasonable doubt". That instruction states the law correctly, however. Further, the brief contains no argument relating thereto. Assignments of error that are not argued or discussed in the brief are deemed to be waived. *State v. Ozanne,* 75 Wn.2d 546, 452 P.2d 745 (1969); *State v. Davis,* 60 Wn.2d 233, 373 P.2d 128 (1962).

Next, defendant assigns error to the admission of evidence that on the afternoon of April 3 the victim's husband gave her four $20 bills which she placed in a wallet in her purse. During the day she spent approximately $15 for groceries and some liquor and, thereafter, went to a beauty shop. When her body was discovered, her purse, which was usually kept in the bedroom, was found open on the kitchen drainboard with its contents strewn about. Only 86 cents in coins remained therein.

There was evidence that when the troops were paid on March 31, 1970, the defendant received only $10. During the evening of April 3, while at the above-mentioned party, defendant informed another soldier that he had no money.

After killing the victim and setting fire to her home, defendant took a taxi back to the base, for which he paid in excess of $5. At about 9:30 a.m. the next morning, he hired another soldier to "pull K.P. duty for him" in return for a $20 bill. When arrested, he had approximately $4 in his possession. The money was explained as a gambling debt which he had collected.

Granted, defendant did not deny killing the victim. However, that acknowledgment, other than by a confession did not occur until after he took the stand in his case-in-chief. On the other hand, the testimony now challenged was elicited during the state's case-in-chief. It occurred at a time when the state did not know whether defendant would admit either his presence at the scene of the crime or his responsibility for the killing. Thus, when the testimony was elicited, the state was obliged to identify defendant as the

perpetrator of the crime and to place him in the victim's home.

■ The state was warranted in presenting all available relevant testimony tending to identify the defendant as the one who committed the offense charged. *State v. Goebel,* 40 Wn.2d 18, 21, 240 P.2d 251 (1952). Proper evidence will not be excluded because it may also tend to show that the accused has committed another crime, unrelated to the one with which he is charged. The test is whether the questioned evidence tends to establish motive, intent, absence of accident or mistake, common scheme or plan, or, as in this case, *identity* or *presence. State v. Sedam,* 46 Wn.2d 725, 729, 284 P.2d 292 (1955); *State v. Hartwig,* 45 Wn.2d 76, 79, 273 P.2d 482 (1954); *State v. Goebel, supra; State v. Goebel,* 36 Wn.2d 367, 368-69, 218 P.2d 300 (1950). The evidence objected to herein was highly relevant. It does not fall within that area of marginal relevancy mentioned in the earlier *Goebel* case which gave rise to the criticism that the evidence was prejudicial because it generated more heat than light.

The financial status of the victim before and after the killing was admitted without objection. The court did not err in admitting testimony about defendant's financial status during the same period of time. It was relevant to establish his presence at the scene of the crime as well as to identify the perpetrator of the crime charged.

Defendant contends the trial court erred by refusing to grant his motion to waive a jury and to proceed to trial before the court. He argues that RCW 9.48.030 and 10.01.060 violate his constitutional right to equal protection because other persons charged with crimes are granted the right to waive a jury which is denied him because he has been charged with first-degree murder.

■ Without question, the two statutes require trial by jury when one has been charged with first-degree murder. In *State v. Baker,* 78 Wn.2d 327, 474 P.2d 254 (1970), we held, however, that the basic constitutional right that is protected is the *right to have a trial by jury.* In *Baker* we

rejected the argument that the foregoing statutes, which extend and preserve that right, could simultaneously be considered an invidious discrimination violative of the Fourteenth Amendment. *See also, State v. Music,* 79 Wn.2d 699, 489 P.2d 159 (1971).

Next, defendant claims error because the jury panel failed to include anyone under the age of 21 years. He asserts that he was entitled to an impartial jury from which there had been no systematic exclusion of one category of citizens (*i.e.,* those under age 21).[3]

Nothing in the state constitution touches the issue of a juror's age. However, RCW 2.36.070 provides:

> No persons shall be competent to serve as a juror in the superior courts of the state of Washington unless he be
>
> . . .
>
> (3) over twenty-one years of age,[4]

Concerning qualifications of jurors, the United States Supreme Court stated in *Carter v. Jury Comm'n,* 396 U.S. 320, 332-34, 24 L. Ed. 2d 549, 90 S. Ct. 518 (1970):

> It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, *to persons meeting specified qualifications of age* and educational attainment, and to those possessing good intelligence, sound judgment, and fair character . . .
>
> . . . Nearly every State requires that its jurors be citizens of the United States, residents of the locality, *of a specified minimum age,* and able to understand English.
>
> . . .
>
> Provisions of similar breadth have been challenged here and sustained before.

(Footnotes omitted. Italics ours.)

We hold that the age qualification in force at the time of

---

[3]It is of interest that the defendant was only 3½ months shy of age 21 at the time of trial.

[4]Amended subsequently by Laws of 1971, Ex. Ses., ch. 292, § 3, p. 1604.

trial bore a reasonable relationship to juror qualification and was constitutional.

Defendant assigns error to the trial court's refusal to give his following proposed instruction:

You are instructed that a person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirements of law.

The proposed instruction is an adaptation of section 4.01 of the American Law Institute Model Penal Code (proposed final draft No. 1, April 1961). Defendant argues that the testimony of certain psychiatrists indicates that his history, coupled with his consumption of alcohol and marijuana on the day in question, diminished his capacity to form an intent to commit rape. Thus, it is contended, that the proposed instruction is more accurate and more meaningful than the M'Naghten rule presently followed by this court.

Subsequent to the filing of defendant's brief, we had an opportunity to consider the test proposed by the American Law Institute. After careful review of all factors, we rejected it and adhered to the M'Naghten rule. *State v. Reece,* 79 Wn.2d 453, 486 P.2d 1088 (1971). We again assert our adherence to that rule.

Defendant argues that he was denied due process and equal protection of the law because the trial court's instructions failed to provide the jury with guidelines or standards to be used in considering the death penalty. This issue was recently decided contrary to defendant's contention in *McGautha v. California,* 402 U.S. 183, 207, 28 L. Ed. 2d 711, 91 S. Ct. 1454 (1971). The United States Supreme Court held in part as follows:

In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution. The States are entitled to assume that jurors confronted with the

truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision and will consider a variety of factors, many of which will have been suggested by the evidence or by the arguments of defense counsel.

(Footnote omitted.) Further, we held in *State v. Cerny,* 78 Wn.2d 845, 854, 480 P.2d 199 (1971):

RCW 9.48.030, which permits the jury to make a special finding imposing the death penalty in first-degree murder cases, is not unconstitutional and invalid on the ground that it fails to provide standards to guide the jury in determining whether the death penalty should be imposed.

We are not persuaded that we should overrule our holdings in *State v. Cerny, supra; State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968); or our most recent decision in *State v. Music,* 79 Wn.2d 699, 489 P.2d 159 (1971).

Defendant asserts that the trial court erred by imposing the death sentence. It is urged that the death penalty is cruel and unusual punishment, and, thus, is violative of the eighth amendment to the United States Constitution.

▮ Nothing has been cited to support this position. On the other hand, we rejected the same argument in *State v. Smith, supra,* after an exhaustive discussion of relevant authorities. As we pointed out in *State v. Cerny, supra,* the determination of an appropriate punishment for any given criminal activity is a legislative function. We then went on to say, at page 855:

Mercy to a defendant, or the possibility of rehabilitating the offender, are but two aspects of sentencing; the needs of society, and the deterrence of others similarly inclined are also legitimate ends to be considered by the legislature.

In *State v. Music, supra,* we reaffirmed the reasoning and result reached in *Smith* after noting that the issue is

pending in the United States Supreme Court.[5] At this time, we continue to adhere to our prior decisions on the subject.

The judgment is affirmed.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, HALE, NEILL, and WRIGHT, JJ., concur.

Petition for rehearing denied May 22, 1972.

[5]On June 28, 1971, the United States Supreme Court granted a petition for writ of certiorari in *Furman v. State,* 225 Ga. 253, 167 S.E.2d 628 (1969) and in *People v. Aikens,* 70 Cal. 2d 369, 450 P.2d 258, 74 Cal. Rptr. 882 (1969). *See* 403 U.S. 952, 29 L. Ed. 2d 863, 91 S. Ct. 2282-83 (1971).