FILED
8/2/2021
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 81247-5-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| AMANUEL TESFASILASYE, | ) | |
| AMANUEL TESFASILASYE-GOITOM, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Amanuel Tesfasilasye challenges his conviction for rape in the third degree. He argues the trial court erred in allowing the State to exercise peremptory challenges against two jurors in violation of GR 37. He further contends the prosecutor engaged in prosecutorial misconduct during closing arguments, violating his right to a fair trial. We reject both arguments and affirm.

FACTS

In 2017, Tesfasilasye worked as a driver for Solid Ground, a company that contracts with King County Access Transportation (Access) to transport people living with disabilities. One of Access's clients, C.R., is blind. C.R. uses Access to travel to stores, appointments, her church, and her job. Because of her disability, the transit driver often helps C.R. exit the transit van and walks her to her door.

Citations and pin cites are based on the Westlaw online version of the cited material.

On December 6, 2017, the Access driver picked up C.R. and several co-workers from their employer's place of business to drive them home. C.R. was the last rider to be dropped off. C.R. recognized the driver as the same person who had driven her home on December 1, 2017. Tesfasilasye was identified as the driver on December 1 and 6, 2017.

According to C.R., when they arrived at her home on December 6, the driver offered to carry her to her door because he knew she had experienced a dizzy spell on December 1. C.R. told Tesfasilasye she wanted to walk herself but, over her objection, he picked her up and carried her piggy-back style to her door.

Tesfasilasye put C.R. down to unlock her door but then followed her inside. C.R. testified that Tesfasilasye started touching and kissing her inappropriately and asked "Do you want to f ---?" C.R. told him "No, I don't want to do it; I'm not going to do it." Tesfasilasye persisted, continuing to touch her, and eventually digitally penetrated her vagina. He also grabbed her hand and forced her to touch his exposed penis. She repeatedly told him she did not "want to do it." When she told him she did not feel well and needed to lie down, he left.

C.R. locked the door behind him and sat on her couch to process the event. She was in shock and decided not to call the police because she was unable to give a physical description of her assailant.

The next day, C.R. reported the incident to people at work, including her boss. Her boss called Access and the police to report what had happened.

While Tesfasilasye acknowledged driving C.R. home that day, he denied carrying C.R. to her door or committing any sexual misconduct. He insisted that

he merely offered C.R. an arm, which she took, and guided her to her door. Tesfasilasye testified that when C.R. opened her door, he commented on the darkness of her home and, when she indicated it was fine, he left to sit in his vehicle for a ten-minute break.

The State charged Tesfasilasye with third degree rape and the jury convicted him as charged. He was sentenced to 12 months in King County Jail.

ANALYSIS

A. Peremptory Challenges

Tesfasilasye first contends the trial court erred in allowing the State to peremptorily strike Juror 25, an Asian American woman, and Juror 3, a Latino man, because an objective observer could have viewed race as a factor in each of the State's decisions. The record does not support this argument.

In Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court developed a three-part test to determine whether a peremptory challenge was based on improper discrimination. Under this test, the party objecting to the peremptory strike must make a prima facie showing of purposeful discrimination. Id. at 93-94. If such a showing is made, the burden shifts to the challenged party to provide a race-neutral explanation for the strike. Id. at 97. The trial court then has the duty of determining whether the objecting party has established purposeful discrimination. Id. at 98.

In 2018, the Washington Supreme Court adopted GR 37 to address concerns that Batson did not adequately remedy unconscious bias in the jury selection process. State v. Jefferson, 192 Wn.2d 225, 242-43, 429 P.3d 467

(2018). This rule allows a party to "object to the use of a peremptory challenge to raise the issue of improper bias." GR 37(c). After the objection, the party exercising the peremptory strike must articulate a reason for the challenge. GR 37(d). "The court shall then evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances." GR 37(e). The court must deny the peremptory challenge if it determines that an objective observer could view race or ethnicity as a factor in the use of the challenge. GR 37(e). The relevant objective observer is one who "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f).

The rule provides guidance to trial courts for assessing a party's reason for a particular peremptory strike. Under GR 37(g), a court may take the following nonexclusive factors under consideration:

(i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

(ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;

(iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;

(iv) whether a reason might be disproportionately associated with a race or ethnicity; and

(v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

And the Supreme Court has identified, in GR 37(h), a list of reasons for a peremptory challenge that, because of their historical association with improper discrimination in jury selection, are "presumptively invalid:"

(i)  having prior contact with law enforcement officers;

(ii)  expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling;

(iii)  having a close relationship with people who have been stopped, arrested, or convicted of a crime;

(iv)  living in a high-crime neighborhood;

(v)  having a child outside of marriage;

(vi)  receiving state benefits; and

(vii) not being a native English speaker.

The question of whether the average reasonable person could view race as a factor in the use of a peremptory challenge is an objective inquiry. Jefferson, 192 Wn.2d at 249. We therefore review the application of GR 37 de novo. State v. Omar, 12 Wn. App. 2d 747, 751, 460 P.3d 225 (2020).

Juror 25

Tesfasilasye first challenges the propriety of allowing the State to strike Juror 25, an Asian American woman.

During voir dire, the court asked prospective jurors to fill out a questionnaire that included questions regarding jurors' prior experiences with sexual abuse or misconduct. Juror 25, who indicated that she or a relative had previously been a victim of sexual assault, asked to be questioned about this experience outside the presence of the venire. During this individual questioning session, the court asked

Juror 25 about the circumstances of the prior experience, and Juror 25 stated she had been a victim of sexual assault as a child. The court asked how she felt about sitting on a case involving an alleged sexual assault between adults, to which she responded "you just never know, you know, what my reaction will be" but nevertheless felt she would be able to separate her personal experience from the issues presented in the case.

Juror 25 had also indicated on the questionnaire that she was "not sure" if she could be fair in a case involving allegations of sexual assault. When asked to explain her answer, Juror 25 disclosed that her son had recently been convicted of sexual assault. She indicated that he had admitted to having engaged in sexual play with a six-year-old, during which he had put the child's hand on his genitals. But, Juror 25 recounted, the victim's version of events "was completely so different than his experience." Juror 25 explained that her son's attorney advised her and her son not to take the case to trial because of the "Me, too, Movement" and because it was her son's word against the victim's. Her son pleaded guilty, despite the fact that Juror 25 thought the allegations were untrue. She acknowledged that "there's been a lot of trauma involved with that." But Juror 25 said she could remain objective and the State did not challenge her for cause.

Later, during general voir dire, Juror 25 returned to the topic of her son's prosecution again. She explained:

> The outcome was, uh, the sentencing was much harsher than what had happened due to age-related issues and when it was reported. I think that in the courtroom, the judge recognized it, but at the same time because of the laws nothing could be done about it. So in my personal opinion, I mean, not just from this experience but just overall, you know, there are definite circumstances where laws get

in the way to having a fair outcome or justice being done, if you will, so.

The State exercised a peremptory strike against Juror 25 and Tesfasilasye objected under GR 37. In response to the court's request for the State's reasons for striking Juror 25, the prosecutor raised concerns about "her ability to truly be fair and impartial in this case" based on her personal experiences. Among other things, the prosecutor highlighted the fact that Juror 25 described her son's experience as traumatic and "talked about the fact that she did not believe that the perpetrator in that dynamic had actually committed the crime even though she wasn't there and seemed to sort of just assume certain facts in favor of one side or the other without fully considering what was being said."

Tesfasilasye argued that this reason for striking a juror was presumptively invalid under GR 37(h). The State disagreed, contending that it did not strike Juror 25 because her son had been convicted of a crime, but because Juror 25 had "taken a position in that case about what happened in that case without being fully informed" and the State was concerned that her perceptions of injustice would spill over into this case.

The trial court found that the personal circumstances of Juror 25's experience during her son's prosecution sufficed to rebut any presumption of invalidity under GR 37 and concluded that an objective observer could not view Juror 25's race as a factor in the peremptory challenge.

Tesfasilasye argues this ruling should be reversed. First, he contends that the State's reasons for excusing Juror 25 were presumptively invalid under GR 37(h)(iii). While the State concedes that GR 37(h)(iii) is implicated in this case, it

argues it successfully rebutted the presumption of invalidity because of the unique circumstances of Juror 25's involvement in her son's prosecution and her personal beliefs about the justice of his conviction and sentence. We agree with the State.

The State's challenge of Juror 25 was not based solely on her relationship with a person convicted of a crime. Rather, the challenge was based on Juror 25's belief that her son had not committed the alleged sexual assault of which he was convicted and was unduly punished for it, that the victim's version of events was significantly different than her son's story of what had occurred, and that the circumstances of her son's crime were similar to this case. In both cases, the State alleged that the defendant had forced a vulnerable victim to touch the defendant's genitals. Juror 25's comments demonstrated that she felt her son had been treated unfairly. Despite acknowledging that her son admitted to his actions, Juror 25 felt "none of it was true," and expressed the sentiment that "laws get in the way to having a fair outcome or justice being done." Juror 25 admitted that the experience had been traumatic for her family, that she was "not sure" that she could be fair, and that she was unsure what her reaction would be to a case involving sexual assault. Juror 25's comments during voir dire created reasonable doubts about her ability to be impartial despite her assurances to the contrary. This situation is easily distinguishable from the more general contact with the criminal justice system referenced in GR 37(h)(iii).

Next, Tesfasilasye argues that even if not presumptively invalid, the reasons the State gave implicate GR 37(g)(iv). GR 37(g)(iv) permits the court to consider whether a reason might be disproportionately associated with a race or ethnicity.

Tesfasilasye contends the State's challenge of Juror 25 was based on her perspective of the criminal justice system, a reason disproportionately associated with people of color. He relies on State v. Listoe, 15 Wn. App. 2d 308, 475 P.3d 534 (2020).

In Listoe, the defendant was charged with possession of methamphetamine with intent to deliver and possession of a controlled substance. Id. at 311. During voir dire, Juror 17, the only Black juror on the venire, expressed cynicism about the criminal justice system, stating that innocent people still get in trouble. Id. at 314. Later, the State presented a nonsensical hypothetical law and asked the venire if they would have problems following a law they could not agree with. Id. at 315. Juror 17 indicated that he would have problems convicting a defendant of a law he disagreed with. Id. When the State sought to peremptorily strike Juror 17, Listoe raised a GR 37 objection. Id. at 316. The State explained that the strike was based on Juror 17's responses, which the State believed indicated an inability to follow the law. Id. The trial court allowed the strike. Id. at 317.

On appeal, Division Two concluded that the strike was improper. Id. at 319. The court noted that Juror 17 had never indicated that he would not follow the law, but had "merely expressed discomfort at the idea of convicting someone under a hypothetical scenario involving a ridiculous law." Id. at 324. The court went on to conclude that, regardless of how persuasive the State's race-neutral reason was, an objective observer aware of the realities of implicit bias could view race as a factor in the State's peremptory challenge because Juror 17 was the only person

of color in the venire and the only juror who voiced skepticism about the criminal justice system. Id. at 324.

Listoe is distinguishable. Here, unlike Listoe, Juror 25 was not the only minority juror on the venire, nor was she the only Asian-American juror. Moreover, the State did not strike Juror 25 for expressing a general skepticism of the criminal justice system, as the State did in Listoe. Here, the State challenged her because of a negative experience she had with her son in a factually comparable case, which created questions about her ability to remain objective when evaluating allegations of sexual assault.

Finally, Tesfasilasye argues that the challenge implicated GR 37(g)(iii) because Juror 11 provided similar answers but was not challenged by the State, implicating GR 37(g)(iii). Under GR 37(g)(iii), the court may consider whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge. This argument is not supported by the record.

During voir dire, the attorneys asked jurors how they would feel about rendering a verdict at the end of trial if they were still unsure of what had occurred. In response, Juror 11 discussed their discomfort deciding the case either way if the evidence was unclear, especially in situations where the potential consequences for the defendant could be severe. Tesfasilasye compares this comment to Juror 25's statements about the harshness of her son's sentence.

While the State did comment on Juror 25's perception of sentencing while explaining why it sought to excuse her, it was by no means the entire–or even the primary–justification for her removal. Juror 25 was challenged because the totality

of her statements painted a picture of potential bias. The same cannot be said of Juror 11.

We cannot conclude from these facts that an objective observer could have viewed race as a factor in the State's decision to strike Juror 25. The court did not err in overruling Tesfasilaye's GR 37 objection.

<u>Juror 3</u>

Tesfasilasye next contends the trial court erred in allowing the State to peremptorily strike Juror 3, a Latino man.

During voir dire, defense counsel asked whether any jurors would presume that a sexual assault victim was telling the truth. Juror 3 indicated he would, and later explained that, in the past, he has instinctually sided with the victim. But because he recognized that this instinct tips the scales against the accused, he would "try and weigh the facts heavier." He went on to say that he has empathy and sympathy for the accused "because I know that in many people's eyes he's already guilty."

In response, the prosecutor asked if he would hold the State to a higher burden of proof and require more evidence than that needed to prove Tesfasilasye's guilt beyond a reasonable doubt. When Juror 3 said he was unsure, they had the following exchange:

> [PROSECUTOR]: Yeah. I guess what would it take to convince you in this case beyond a reasonable doubt in a case like this, like what type of evidence would you want to see?
>
> JUROR: Um, eyewitnesses - - this is going to sound stupid, I don't know, DNA samples, I don't know, whatever - - whatever evidence is the evidence of the day that, you know, provides a yes or a no accurately, you know. I don't watch CSI, I'm not sure what types of

things, but it can't be like hearsay, like, oh, yeah, I saw him walking out of the room, maybe. You know what I mean? It's got to be concrete.

[PROSECUTOR]: Well, you just said eyewitnesses and then you said it can't be somebody who says I just saw him walk out of the room. So what do you mean by eyewitnesses, I guess?

JUROR: Like someone who saw the person commit the crime or saw the person, you know, with the candlestick walk out at 11:02 exactly at the time that the person screamed, oh, rape, you know, like that's okay, like that's pretty good.

The State exercised a peremptory challenge against Juror 3 and Tesfasilasye again objected under GR 37. The prosecutor explained that the State sought to remove Juror 3 "because his answer to me was so unreasonable about there needing to be eyewitnesses to a rape case. I just think he was so shortsighted about the type of case this is and the type of evidence that he would require from the State." The prosecutor felt "like he had this like set of evidence that he expects from the State that would be frankly impossible to find in most legitimate otherwise strong sex offense cases." The prosecutor went on "I don't think there's really, truly any evidence that the State could provide to prove the case beyond a reasonable doubt to that man."

Tesfasilasye argued the strike was race-based and the State was "trying to work him towards the answer [it] wanted" because he had highlighted the fact that he was from an immigrant family. The trial court disagreed with Tesfasilasye and stated that Juror 3 gave the impression that "he could not convict on a circumstantial evidence case." The court found that an objective observer could not have concluded that this was a race-based challenge and overruled the GR 37 objection.

- 12 -

Tesfasilasye challenges the trial court's ruling, arguing that an objective observer could conclude that race was a factor in the State's decision to strike Juror 3 because the State mischaracterized his statements and other jurors, who the State did not seek to strike, gave similar answers. Neither contention is supported by the record.

Tesfasilasye first contends that Juror 3 never explicitly stated that he would not convict if the only evidence presented was circumstantial. But Juror 3 did explicitly say he would require "concrete" evidence to corroborate a rape allegation. And he explained that eyewitness testimony would be sufficient only where it directly corroborated the victim's complaint. These statements do demonstrate, as the court found, that Juror 3 could be unwilling to convict a defendant of rape if the only evidence was circumstantial in nature.

Tesfasilasye further contends that racial bias can be inferred from the fact that the State did not challenge other jurors who made similar comments, implicating GR 37(g)(iii). He points to comments made by Jurors 7, 31, 34, and 40. Again, we disagree.

When asked if they could convict without eyewitnesses, Juror 7 said "Yes, if there's evidence . . . . Like one of the other jurors suggested, maybe some DNA, I don't know, I'd need to see all the evidence, all of the circumstances." Unlike Juror 3, Juror 7 clarified they would need to see "all the evidence," and made no definitive comment that they expected direct, or corroborating evidence from an eyewitness to convict.

Juror 31 indicated that while it would be easier to decide a case with direct evidence, they would want to look at everything and felt they could balance the circumstantial and direct evidence. Juror 31 explicitly said "I wouldn't have a preference one over the other." Again, unlike Juror 3, Juror 31 was open to considering all of the evidence presented.

Juror 40 responded similarly, stating "I think in general direct evidence is going to be stronger than circumstantial evidence" but explained that the "key issue is whether or not it corroborates the other evidence in the trial" because the jury has the responsibility of determining the facts. Juror 40 did not suggest they would need direct evidence or eyewitness testimony to corroborate a victim's testimony before convicting a defendant of rape. And the last juror to be seated after both sides exercised their eight peremptory challenges was Juror 39. The State did not chose to retain Juror 40 over Juror 3—the jury was empaneled before either party had to consider challenging Juror 40.

Finally, the prosecutor asked Juror 34 if they were comfortable deciding a case on circumstantial evidence. Juror 34 responded "I guess it would be to what degree that the evidence was more exacting than circumstantial" but indicated that they had not thought it through and asked the State to come back to ask them the question after they had time to consider the question. Neither party questioned Juror 34 further but Tesfasilasye exercised his sixth peremptory challenge to remove this juror as soon as they were placed into the jury box. We cannot conclude the State treated Juror 34 differently than Juror 3 given the fact that

Tesfasilasye removed this juror from the panel before the State had the opportunity to do so.

State v. Lahman, No.37092-5-III, slip op. (Wash. Ct. App. June 15, 2021),[1] a recent decision from Division Three of this court is instructive on whether a prosecutor's articulated reason for striking a juror of color is credible after comparing answers given by different jurors. In that case, the defendant was on trial for the domestic violence assault of his girlfriend. Id. at *2. The State exercised a peremptory challenge against a young man with an Asian surname and one of the few racial minorities on the venire. Id. at *3-4. This juror had barely spoken during voir dire, saying only that he felt jury duty was a civic duty and that, when rendering a verdict, he would stick to his viewpoint regardless of whether other jurors disagreed. Id. When Lahman challenged the peremptory strike under GR 37, the State explained it was striking the juror because he was young and did not have any experiences with domestic violence. Id. at *5. The trial court overruled a GR 37 objection, concluding it was based on race-neutral reasons. Id.

On appeal, Division Three concluded that "the State's explanation for why it struck [the challenged juror] is insufficient to dispel the concern" that an objective observer could view race as a factor in the State's decision. Id. at *14. The juror had been asked very few questions and was therefore deprived of "a realistic opportunity to explain himself and his circumstances." Id. at 12. While the juror had indicated on a questionnaire that he had no prior experience with domestic violence, so had 22 other members of the venire. Id. Because there was little to

_____

[1] https://www.courts.wa.gov/opinions/pdf/370925_pub.pdf.

support the State's reasons, the court concluded that "the record left open the possibility that the prosecution implicitly and unsuitably relied on a stereotype" in deciding to strike that juror. Id. at 14.

This case is distinguishable. First, unlike the Lahman juror, Juror 3 was questioned at length. The State's decision to exercise a peremptory strike was based entirely on—and was supported by—his answers to those questions. Second, his answers were markedly different from other prospective jurors on the venire. Juror 3 expressed expectations and a preference for direct evidence in a rape case;[2] the other comparable jurors did not do so. Unlike in Lahman, the record here is sufficient to dispel any concern that an objective observer could view race as a factor in Juror 3's exclusion.

B. Prosecutorial Misconduct

Tesfasilasye next contends he did not have a constitutionally fair trial because the prosecutor created an inference of guilt by referring to Tesfasilasye's decision to testify and by misstating the burden of proof.

To establish prosecutorial misconduct during closing argument, a defendant must show that the prosecuting attorney's statements were both improper and prejudicial. State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). We determine whether the defendant was prejudiced under one of two standards of review. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). To show prosecutorial misconduct, the defendant has the burden of establishing that (1) the

---

[2] It is well-established in Washington that the elements of rape may be proved by circumstantial evidence as that evidence is no less valuable than direct evidence. See State v. Boggs, 80 Wn.2d 427, 431, 495 P.2d 321 (1972); 11 WASHINGTON PRACTICE, PATTERN JURY INSTRUCTIONS: CRIMINAL 5.01 at 188 (5th ed. 2021).

State acted improperly, and (2) the State's improper act prejudiced the defendant. Id. at 756. We must consider the prosecutor's conduct in the context of the record and all the circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).

If the defendant made a timely objection at trial, he must demonstrate that any improper conduct "resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." Allen, 182 Wn.2d at 375. However, when a defendant fails to object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61. In order to prevail under this heightened standard, the defendant must show that (1) no curative instruction could have eliminated the prejudicial effect, and (2) there was a substantial likelihood the misconduct resulted in prejudice that affected the verdict. Id. at 761.

Inference of Guilt

Tesfasilasye argues that the prosecutor inappropriately suggested to the jury that he exercised his right to testify to deceive the jury, thereby creating an improper inference of guilt.

During closing, the prosecutor directed the jury to look at each "person's motive[;] why are they taking the stand and saying what they're saying." The prosecutor asked the jury to evaluate Tesfasilasye's credibility:

> [Solid Ground employees are] not allowed to go into somebody's house. Door-to-door is not something they're supposed to do. The defendant even testified to that. Why would he reach in and turn on

a light for a blind person? And he knew that [he] shouldn't have done that, that's why he took the stand and denied it.

Tesfasilasye did not object.

Tesfasilasye argues that this statement improperly commented on his decision to exercise his constitutional right to testify. We agree the comment was improper but conclude Tesfasilasye waived the error by failing to object at trial. We further conclude Tesfasilasye has failed to demonstrate that no curative instruction could have eliminated any prejudicial effect.

State v. Teas, 10 Wn. App. 2d 111, 447 P.3d 606 (2019) is dispositive of Tesfasilasye's argument. In that case, the defendant, who was accused of sexually assaulting a woman, testified at trial and denied the allegations. Id. at 117. During closing arguments, the prosecutor highlighted the fact that DNA evidence placed Teas in the victim's bedroom and suggested that Teas took the stand to testify to address the overwhelming evidence against him. Id. at 119. The prosecutor told the jury "'And so that's why he got on the stand yesterday and came—came up with a story to try and explain away what happened.'" Id. Teas did not object to these statements. Id.

Division Two of this court agreed with Teas that "it is improper for [a prosecutor] to speculate as to why a defendant testified to infer guilt." Id. at 123. The State's comment implied that Teas knew he was guilty and only testified to explain the evidence against him. Id. at 124. But Teas did not object at trial and the court concluded the comments were "not so flagrant and ill intentioned that the resulting prejudice could not be cured with a jury instruction." Id. at 123.

Teas is analogous to this case. As in Teas, the prosecutor here speculated as to Tesfasilasye's motives for testifying and implied that he did so only to deny evidence against him. The State's comment implied that Tesfasilasye knew he was guilty and took the stand solely to deny his guilt. The State seems to concede this point. However, as in Teas, Tesfasilasye failed to object[3] and Tesfasilasye has not demonstrated why the prosecutor's comment could not have been cured by an instruction to the jury to disregard the argument.

Tesfasilasye urges us to reject the "flagrant and ill intentioned" standard because the improper comment was a direct attack on his constitutional rights. App. Reply at 14. Washington courts have long held that prosecutors' improper comment on a defendant's exercise of constitutional rights are evaluated under the constitutional harmless error standard. Emery, 174 Wn.2d at 757. But as Teas recognized, we do not apply that standard until we conclude the defendant preserved the error for appeal. 110 Wn. App. 2d at 122. In cases where a defendant fails to object, Washington courts must decide whether the issue has been preserved for appeal before analyzing whether the error was harmless beyond a reasonable doubt. See State v. Espey, 184 Wn. App. 360, 369-70, 336 P.3d 1178 (2014) (applying the "flagrant and ill intentioned" standard before

---

[3] Tesfasilasye maintains he preserved this issue by filing a pretrial motion in limine asking the court to bar the State from arguing that "unfavorable inferences can be drawn from any exercise of a constitutional right." However, Tesfasilasye had a duty to object to violations of any orders in limine. "In a situation where a party prevails on a motion in limine and thereafter suspects a violation of that ruling, the party has a duty to bring the violation to the attention of the court and allow the court to decide what remedy, if any, to direct." A.C. v. Bellingham Sch. Dist., 125 Wn. App. 511, 525, 105 P.3d 400 (2004). "A standing objection to evidence in violation of a motion in limine, preserving the issue for appeal, is only allowed to the party losing the motion. Id. Thus, Tesfasilasye failed to preserve the issue.

evaluating whether the error was harmless beyond a reasonable doubt). We see no compelling reason to deviate from this precedent.

Because Tesfasilasye failed to object to the prosecutor's comment and has failed to demonstrate that any resultant prejudice could not have been cured, he has not demonstrated that the comment was flagrant and ill intentioned and thus has waived this issue for appeal.

<u>Burden of Proof</u>

Tesfasilasye next contends that the State's rebuttal argument inappropriately misstated the law and diluted its burden of proof.

In closing arguments, defense counsel argued that reasonable doubt can come from a lack of evidence. Counsel highlighted the evidence the jury had not seen, noting that the State never presented fingerprint evidence, surveillance footage, a victim medical exam, or a voice lineup.

In rebuttal, the prosecutor explained that there was no fingerprint evidence because there was no evidence Tesfasilasye touched anything in the house, and there was no DNA evidence because nothing suggested that he had left any bodily fluid behind. She then said

> What I am trying to say is be reasonable when you talk about it. I'm asking you to use that common sense. Because it would be easy to say, well, the evidence wasn't as complete, we don't really know what happened. That would be an easy thing to say. I'm asking you to not do that. That would be an unjust thing to do. Look at the reasonableness of the evidence set forth.

Tesfasilasye objected. The court overruled the objection and the prosecutor clarified, "[i]t is important that you evaluate all of the evidence. That would be a

just thing to do. Evaluate all of the evidence. Look at it, and look at it in the context of how reasonable it is."

Tesfasilasye argues that the statement "that would be an unjust thing to do" misstated the State's burden of proof by misrepresenting to the jury that it would be unfair to consider a lack of evidence in returning a verdict. But taken in context, there was no misstatement of the law.

We review allegations of prosecutorial misconduct during closing argument in light of the entire argument, the issues in the case, the evidence discussed during closing argument, and the court's instructions. State v. Sakellis, 164 Wn. App. 170, 185, 269 P.3d 1029 (2011). When reviewing the prosecutor's argument as a whole, it is clear that she was not asking jurors to ignore a general scarcity of evidence. Rather, she asked the jury to think critically about why specific pieces of evidence–such as fingerprint and DNA evidence–might not exist. Moreover, the court instructed the jury that a reasonable doubt could arise from the "evidence or lack of evidence." When viewed in context, the prosecutor did not misstate or dilute the burden of proof.

We therefore affirm Tesfasilasye's conviction.

_Andrus, A.C.J._

WE CONCUR:

_Chun, J._                    _Mann, C.J._

- 21 -